
FILED
*July 29, 2015*
Third Court of Appeals
Jeffrey D. Kyle
Clerk

ACCEPTED
03-14-00570-CR
5932628
THIRD COURT OF APPEALS
AUSTIN, TEXAS
7/3/2015 8:21:32 PM
JEFFREY D. KYLE
CLERK

**No. 03-14-00570-CR**

**IN THE COURT OF APPEALS FOR THE THIRD DISTRICT OF TEXAS**

RECEIVED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
7/3/2015 8:21:32 PM
JEFFREY D. KYLE
Clerk

ERIC BYRON CRAYTON, Appellant

v.

THE STATE OF TEXAS, Appellee

On Appeal from the 207th Judicial District Court of Comal County, Texas
Cause No. CR2012-225
Honorable Jack Robison, District Judge Presiding

**BRIEF FOR THE STATE**

**Jennifer Tharp**
**Criminal District Attorney**

**By**
**Clayten Hearrell**
**SBN: 24059919**
**Assistant District Attorney**
**150 N. Seguin Avenue, Suite #307**
**(830) 221-1300**
**Fax (830) 608-2008**
**New Braunfels, Texas 78130**
**E-mail: hearrc@co.comal.tx.us**
**Attorney for the State**

**Oral Argument Is Requested**

i

## IDENTITY OF PARTIES AND COUNSEL

Appellant – Eric Byron Crayton

Appellee – The State of Texas

**Attorneys for the Appellant**

Josh Erwin
The Erwin Law Firm, L.L.C.
109 E. Hopkins Street, Suite 200
San Marcos, TX 78666
*For the Appellant at Trial*

Amanda Erwin
The Erwin Law Firm, L.L.C.
109 E. Hopkins Street, Suite 200
San Marcos, TX 78666
*For the Appellant on Trial*

Richard Wetzel
SBN: 21236300
wetzel_law@1411west.com
1411 West Ave., Suite 100
Austin, TX  78701
(512) 469-7943
(512) 474-5594
*For the Appellant on Appeal*

**Attorney for the Appellee**

Clayten Hearrell
Assistant Criminal District Attorney
Comal County Criminal District Attorney's Office
150 N. Seguin Avenue, Suite 307
New Braunfels, Texas 78130
*Attorney for the State at Trial and on Appeal*

ii

# Table of Contents

Index of Authorities ................................................................................................v

Statement of the Case ..............................................................................1

Statement of Facts ..................................................................................3

1. STATE'S RESPONSE TO APPELLANT'S FIRST POINT OF ERROR ..............................................................................11

*Summary of the Argument* ...............................................................11

**Facts Pertinent to the 38.22 Warnings** .....................................12

**Waiver** .................................................................................16

**Standard of Review** .............................................................18

**Authorities Regarding 38.22** .................................................19

**Argument Regarding the *Bible* Factors** .............................22

2. STATE'S RESPONSE TO APPELLANT'S SECOND POINT OF ERROR .............................................................................27

*Summary of the Argument* ...............................................................27

**Facts Pertinent to Invocation of Right to Remain Silent** ...................28

**Waiver** .................................................................................30

**Standard of Review** .............................................................32

**Authorities Regarding Invocation of the Right to Remain Silent** .....33

**Argument Regarding Invocation of the Right to Remain Silent** .......34

3. STATE'S RESPONSE TO APPELLANT'S THIRD POINT OF ERROR .................................................................................................39

*Summary of the Argument* ..............................................................39

**Facts Relevant to Legal Sufficiency** ....................................40

**Authorities on Legal Sufficiency** ........................................42

**Argument on Legal Sufficiency** ...........................................44

4. STATE'S RESPONSE TO APPELLANT'S FOURTH POINT OF ERROR .................................................................................................49

*Summary of the Argument* ..............................................................49

**Facts Relevant to Corpus Delecti** .......................................50

**Authorities on Corpus Delecti** ............................................52

**Argument on Corpus Delecti** ................................................54

Prayer for Relief....................................................................................58

Certificate of Service ...........................................................................59

Certificate of Compliance ....................................................................59

# INDEX OF AUTHORITIES

**CASE**            **PAGE**

*Berghuis v. Thompkins* 560 U.S. 370
(2010) ................................................................................ 33

*Bible v. State,* 162 S.W.3d 234 (Tex.
Crim. App. 2005) ............................................................ 20-26

*Briscoe v. State*, 03-11-00014-CR,
2013 WL 4822878, at *1 (Tex. App.
—Austin Aug. 29, 2013, no pet.)
(not designated for publication) ......................................... 46

*Bulington v. State*, 179 S.W.3d 223
(Tex. App.—Texarkana 2005, no pet.) ................................ 52

*Carrizales v. State,* 414 S.W.3d 737
(Tex. Crim. App. 2013) ...................................................... 53

*Crain v. State,* 315S.W.3d 43 (Tex.
Crim. App. 2010) .......................................................... 18, 32

*Davis v. U.S.* 512 U.S. 452 (1995) ...................................... 33

*Dowthitt v. State* 931 S.W.3d 244
(Tex. Crim. App. 1996) ...................................................... 33

*Dunn v. United States*, 284 U.S. 390
(1932) ................................................................................ 48

*Ex Parte Bagley,* 509 S.W.2d 332
(Tex. Crim. App. 1974) .................................................. 21-22

*Fisher v. State,* 851 S.W.2d 298
(Tex. Crim. App. 1993) ........................................... 52-53, 56

*Franks v. State*, 712 S.W.2d 858
(Tex. App.—Houston [1st Dist.] 1986,
pet. ref'd)...................................................................................20-22

*Guevara v. State*, 152 S.W.3d 45 (Tex.
Crim. App. 2004) .................................................................... 44

*Hayes v. State*, 05-11-00260-CR, 2013
WL 1614108 (Tex. App.—Dallas Feb.
19, 2013, no pet.) (not designated for
publication) ..........................................................................19-20

*Jackson v. Virginia*, 443 U.S. 307
(1979)...................................................................................42-43

*Kiffe v. State*, 361 S.W.3d 104 (Tex.
App.—Houston [1st Dist.] 2011, pet.
ref'd)....................................................................................42-43

*Kupferer v. State* 408 S.W.3d 485
(Tex. App.—Houston [1st Dist.] 2013,
pet. ref'd)............................................................................... 33

*Laster v. State*, 275 S.W.3d 512 (Tex.
Crim. App. 2009) .................................................................... 43

*Lumpkin v. State* 129 S.W.3d 659 (Tex.
App.—Houston [1st Dist] 2004, pet.
ref'd)..................................................................................... 45

*Margraves v. State*, 34 S.W.3d 912
(Tex. Crim. App. 2000)............................................................ 43

*Marshall v. State* 210 S.W.3d 618 (Tex.
Crim. App. 2006) .................................................................... 33

*Martinez v. State,* 348 S.W.3d 919 (Tex.
Crim. App. 2011) ................................................................ 18, 32

*Miller v. State,* 457 S.W.3d 919 (Tex. Crim. App. 2015) ................................................................. 53-54

*Miranda v. Arizona* 384 U.S. 436 (1966) ..................................................................................... 33

*Ramos v. State* 245 S.W.3d 410 (Tex. Crim. App. 2008) ................................................................. 33

*Salazar v. State,* 86 S.W.3d 640 (Tex. Crim. App. 2002) ................................................................. 54

*Steckler v. United Sates,* 7 F.2d 59 (2d Cir. 1925) ......................................................................... 48

*Thomas v. State,* 408 S.W.3d 877 (Tex. Crim. App. 2013) ................................................... 16-17,30-31

*Williams v. State,* 958 S.W.2d 186 (Tex. Crim. App. 1997) ................................................................. 52

*Wilson v. State,* 311 S.W.3d 452 (Tex. Crim. App. 2010) ................................................................. 18, 32

*Young v. State,* 283 S.W.3d 854 (Tex. Crim. App. 2009) ................................................................. 19, 32

**STATUTE**                                                                                      **PAGE**

TEX. CRIM. PROC. CODE art. 38.22 ................................................................. 19-26, 33

TEX. PENAL CODE ANN. § 37.09 ................................................................. 44-45

## STATEMENT OF THE CASE

On May 9, 2012, in Cause Number CR2012-225 in the 207th Judicial District Court of Comal County, Texas, the Grand Jury returned a two-count indictment against Appellant, Eric Byron Crayton, for the felony offenses of Murder and Tampering with Physical Evidence (I C.R. at 8-9).   The first count of the indictment alleged Murder under two alternative charging paragraphs (*id.*).  The second count of the indictment alleged Tampering with Physical Evidence under two alternative charging paragraphs (*id.*).

In addition to the two criminal counts set therein, the indictment also contained two enhancement paragraphs (*id.*).  The first enhancement paragraph alleged that Appellant had been convicted on or about August 4, 2005, in the 22nd District Court of Comal County, Texas of the felony offense of Unlawful Possession of a Weapon by a Felon, committed on or about January 6, 2005; the second enhancement paragraph alleged that Appellant had been convicted on or about November 5, 2002, in the 22nd District Court of Comal County, Texas of the felony offense of Burglary of a Habitation, committed on or about June 17, 1994 (*id.*).  As set out in the enhancement paragraphs, Appellant was a habitual felon subject to a range of punishment from 25 years to 99 years or life in prison. Tex. Pen. Code §12.42(d).

1

A Motion to Suppress Illegally Seized Evidence was filed by Appellant on May 23, 2013 (*id.* at 37-40). A hearing was held on the Appellant's Motion to Suppress on February 18, 2014 (I Supp. II R.R. at 1). At the end of that hearing, the court invited the parties to submit bench briefs on the issues presented during the hearing and took the matter under advisement (*id.* at 53-57). The Appellant filed his brief by letter to the court on February 27, 2014 (I C.R. at 47-53). The Appellee filed his brief with the court on March 10, 2014 (*id.* at 54-68). On June 17, 2014 the court denied in part and granted in part the Appellant's Motion to Suppress (I Supp. I C.R. at 5-8). Specifically, the court ordered that everything contained after 26:03 mark on State's Pre-Trial Exhibit 6 was to be suppressed, but otherwise denied the Appellant's Motion to Suppress (*id.*). The court entered Findings of Fact and Conclusions of Law regarding the Appellant's Motion to Suppress on June 17, 2014 (*id.*).

On August 8, 2014, the jury found Appellant not guilty of the felony offense of Murder as alleged in Count I of the indictment, and found the Appellant guilty of the felony offense of Tampering with Physical Evidence as alleged in Count II of the indictment (I C.R. at 117-118 and VI R.R. at 75). After receiving the jury's verdict in guilt/innocence, the court requested that each side prepare and present briefs to the court explaining how a conviction for Tampering with Physical Evidence could be sustained after an acquittal for the underlying Murder (VII R.R.

2

at 6-7). Both Appellant and Appellee presented briefs and the court allowed the case to continue to punishment on August 11, 2014 (VII R.R. at 6-7).

Prior to trial, Appellant had elected for the jury to assess his punishment in the event he was convicted (I C.R. at 96). At the beginning of the punishment phase of the trial, the enhancement paragraphs of the indictment, making Appellant a habitual offender, were read before the jury. Appellant entered a plea of true to each enhancement paragraph (VII R.R. at 13-14). After hearing evidence and arguments of counsel on punishment, the jury found each enhancement paragraph to be true and assessed Appellant's punishment at a term of 35 years in the Institutional Division of the Texas Department of Criminal Justice (I C.R. at 143-144 and VII R.R. at 61). On August 11, 2014, that sentence of 35 years was imposed in open court (VII R.R. at 62).

On August 27, 2014, Appellant timely filed a notice of appeal (I C.R. at 145). Appellant now seeks reversal of his conviction and an acquittal, reversal of his conviction and a new trial, or other appropriate relief (Appellant's Brief at 34).

## STATEMENT OF FACTS

Around November 1, 2011, Tina Owens moved into a cabin at the Canyon Falls RV Park in Canyon Lake, Texas (III R.R. at 26). Andrea Hebert was a friend of Ms. Owens and helped Ms. Owens move into the Canyon Falls RV Park (*id.*).

3

Shortly after Ms. Owens took up residence at Canyon Falls RV Park, Ms. Hebert started living with Ms. Owens (*id.* at 26-27). During the early part of November 2011, Andrea Hebert began a romantic relationship with another resident of Canyon Falls RV Park named Thomas Kitto (*id.* at 25 - 27). By December 31, 2011, Andrea Hebert and Thomas Kitto were in a committed dating relationship with one another (*id.* at 27).

On January 19, 2012, Andrea Hebert left for work at around 6:00 a.m. (*id.* at 31). She returned to the Canyon Falls RV Park at about 3:00 p.m. that same afternoon (*id.* at 32). Whenever Andrea arrived at the RV park, she found Thomas Kitto sitting in the courtyard with fellow residents Kerry West and Lee Paden (*id.*). Mr. Kitto made her a drink and they talked briefly before Ms. Hebert went inside Tina Owens' cabin (*id.*). Ms. Hebert laid down inside Ms. Owens' cabin and took a nap that lasted between one to two hours (*id.*). Ms. Owens was awakened by a text message from Mr. Kitto and went outside to the courtyard where she sat and visited with Mr. Kitto, Mr. West, Mr. Paden, and Scott Padgett (*id.* at 33). After about five minutes of conversation, Ms. Hebert received a text message from Eric Crayton, Appellant (*id.* at 47). Ms. Hebert informed Mr. Kitto that she was going to meet with Appellant and get a pack of cigarettes (*id.*). Before she left, Ms. Hebert told Mr. Kitto that she did not want to deal with the Appellant's problems (*id.*).

4

A short time later, Ms. Hebert met the Appellant at the Super S convenience store (*id.* at 50). Appellant was sitting in the driver's seat of a vehicle, which belonged to Heidi Trumbower (*id.* at 50-52). Ms. Hebert spoke to the Appellant, who began to describe certain relationship problems he was experiencing (*id.* at 54). Ms. Hebert stopped the Appellant and invited him back to her cabin to talk further (*id.*). The Appellant was instructed to meet Ms. Hebert at the Canyon Falls RV Park (*id.*). When Appellant arrived at the RV park, he sat in his vehicle, awaiting the arrival of Ms. Hebert (*id.* at 55). Ms. Hebert stopped to buy cigarettes and then proceeded to the RV park as well (*id.* at 54).

Upon arrival at the Canyon Falls RV Park, Ms. Hebert parked next to the vehicle Appellant had driven and they each exited their vehicles (*id.* at 55). Ms. Hebert collected her groceries and removed her dog from her vehicle (*id.*). She asked the Appellant to assist her by taking the dog's leash while she carried the groceries and the Appellant obliged (*id.*). During this time, Mr. Kitto was sitting at a table in the common area of the cabins with Mr. Padgett (*id.*). Ms. Hebert and the Appellant walked past Mr. Kitto to Ms. Hebert's cabin (*id.* at 55-58). As they reached the cabin, Ms. Hebert took the dog from the Appellant and began to place the groceries on the porch (*id.* at 58). Mr. Kitto then ran to the Appellant, grabbed him by the shirt, told the Appellant that he was not welcome there, and then threw the Appellant to the ground (*id.* at 59). The Appellant scrambled backwards,

5

trying to return to his feet, while saying "Man, what did I do?" and "You're freaking me out." (*id.* at 60). Ms. Hebert grabbed Mr. Kitto's arm and told him to stop (*id.* at 61). Mr. Kitto hit the Appellant a second time, sending him back to the ground (*id.*). Thereafter, Mr. Kitto returned to his table and sat back down with his back to the Appellant (*id.* at 63). Ms. Hebert went and spoke to Mr. Kitto about what had just transpired with the Appellant (*id.*). The Appellant returned to his feet and approached Mr. Kitto from behind as he sat at the table (*id.*). Ms. Hebert explicitly told the Appellant to leave (*id.* at 64). Although the Appellant's path to his vehicle was unblocked, he chose to remain and seek an explanation from Mr. Kitto (*id.*). During this time, Mr. Kitto initially sat calmly while the agitated Appellant continuously asked, "What did I do?" (*id.* at 63-64).

After about two minutes, Ms. Hebert's dog broke loose from the cabin and starting running around the grounds (*id.* at 65). Ms. Hebert and Mr. Kitto got up from the table and pursued the dog (*id.* at 65-66). As Ms. Hebert and Mr. Kitto pursued the dog, the Appellant shadowed Mr. Kitto across the yard (*id.* at 66). Ms. Hebert and Mr. Kitto managed to catch the dog in front of Cabin G (*id.* at 66). When Ms. Hebert bent over to gain control of the dog, the Appellant squared up face-to-face with Mr. Kitto while Ms. Hebert knelt between them (*id.* at 66). Mr. Kitto then raised his arms, placed his hands on Ms. Hebert, and began pushing her aside (*id.* at 66-71). As Mr. Kitto pushed Ms. Hebert out of the way, she looked

6

towards the Appellant and saw the Appellant pull a fixed-blade knife from his hip. (*id.*). Upon seeing the knife, Ms. Hebert remarked "Really?" and Mr. Kitto exclaimed "Seriously?" (*id.* at 69 -70). Mr. Kitto pushed Ms. Hebert out of the way and she took the dog to her cabin (*id.* at 70-71). When Ms. Hebert turned around, she saw Mr. Kitto standing with his back turned to her in the same position as he had been when he pushed her out of the way and she saw the Appellant was on his back on the ground in front of Mr. Kitto, scrambling backwards (*id.*). Ms. Hebert again yelled at the Appellant to leave (*id.* at 72). As the Appellant regained his footing feet he struggled to pick up something that he had dropped during the assault (*id.* at 72).

Mr. Kitto turned towards Ms. Hebert (*id.*). He then took off his shirt, revealing a very large wound and tried to walk towards Ms. Hebert (*id.* at 73). Mr. Kitto took two steps towards Ms. Hebert and fell (*id.*). As Ms. Hebert ran to Mr. Kitto, she heard a sound like that of gushing water (*id.* at 78). Upon reaching his vehicle, the Appellant pulled out of the parking lot and turned the wrong way into the RV park (*id.* at 74). The Appellant turned around inside the park and then passed in front of the cabins to exit out onto the highway (*id.*). As he passed the cabins, multiple bystanders tried to flag the Appellant down and get him to stop; however, the Appellant fled the scene and continued out onto the highway (*id.* at 75). Mr. Kitto suffered six incised wounds of varying depth to his chest, abdomen,

7

and arms (V R.R. at 125-142). Some of those wounds could have been considered defensive wounds and two of the six wounds suffered by Mr. Kitto were independently capable of causing death (*id.* at 132, 142). One of these wounds pierced the pericardial sac and the right ventricle of the heart, resulting in massive blood loss consistent with the waterfall-like sound reported at the scene (*id.* at 126, 131). First aid efforts were unsuccessful and Mr. Kitto was declared dead at the scene (III R.R. at 176).

Deputies with the Comal County Sheriff's office responded, secured the scene, and began taking statements (*id.* at 174). The Appellant was immediately identified by witnesses at the scene as the actor responsible for Mr. Kitto's injuries and patrol deputies with the Comal County Sheriff's Office immediately began searching for the Appellant (*id.* at 175). Later that night and into the next morning, deputies photographed and collected physical evidence from the scene. On the ground near the body of Mr. Kitto, deputies found a baseball cap and the sheath for a fixed-blade knife (*id.* at 186-189). One of the deputies who originally responded to the scene before being redirected to search for the Appellant was Deputy Chris Koepp (IV R.R. at 84-85). That same evening, Deputy Koepp found the Appellant driving a green pickup truck near his residence (*id.* at 86). Deputy Koepp initiated a traffic stop and the vehicle eventually stopped in a nearby driveway (*id.* at 88). Deputy Koepp ordered the Appellant to place his hands on the squad car (*id.* at 89).

The Appellant appeared compliant with the deputy's commands and walked towards the squad car with his hands in the air, however, when Deputy Koepp lowered his taser and reached for his handcuffs, the Appellant exclaimed "Fuck that. I'm not going back" and proceeded to run on foot (*id.*). Deputy Koepp pursued the Appellant, tackled him in the road, and dragged him back to the squad car where he was secured in hand cuffs (*id.* at 89-91). Prior to his encounter with Deputy Koepp, the Appellant did not have any injuries (*id.* at 91). The Appellant was placed under arrest for the offense of evading arrest or detention and was taken to the Comal County Sherriff's Office (*id.* at 101-102).

Upon arrival at the Comal County Sheriff's Office, Detective Rex Campbell met the Appellant in the interview room (*id.* at 116). Detective Campbell photographed the Appellant, discussed the injuries that Appellant received while evading Deputy Koepp, read the Appellant his 38.22 warning twice and informed him that another officer was on his way to speak to the Appellant (*id.* at 116-123). Prior to entering the interview room, Detective Campbell placed a DVD into the recording system and also turned on the digital recorder that he kept in his pocket (*id.* at 123). After sitting with the Appellant for some time, Detective Campbell stepped into the crime analyst office and turned off his audio recording device (*id.* at 129-130). Thereafter, Detective Campbell discovered that the video recording system had malfunctioned and did not produce a visual recording of his encounter

with the Appellant (*id.* at 123). Upon discovering the error, Detective Campbell restarted the video recording equipment and returned to the room (*id.* at 123). Both sets of 38.22 warnings were recorded on the audio recording and the Appellant agreed to waive his rights and give a statement each time the warnings were read to him (VIII R.R. State's Ex. 72).

An hour and fifteen minutes after the Appellant got to the Sheriff's Office, Sergeant Tommy Ward arrived (I Supp II R.R. at 34). Sergeant Ward spoke to Detective Campbell outside of the interview room to verify that the Appellant had been read his statutory warnings and agreed to give a statement (IV R.R. at 143). Sergeant Ward then began to talk to the Appellant about the death of Mr. Kitto (*id.*). During the course of this interview, the Appellant admitted to stabbing Mr. Kitto with a knife that the Appellant kept in a sheath in his back pocket (VIII R.R. State's Ex. 73). The Appellant further stated during that interview that he lost the sheath to the knife and that he threw the knife into Sorrell Creek (*id.*). Based on the assertions made during the interview with the Appellant, Sergeant Ward secured a search warrant for the Appellant's residence and sent multiple deputies to search Sorrell Creek for the knife used in the assault (IV R.R. at 148-149). Deputies were not able to locate the knife in Sorrell Creek (*id.* at 149). The following morning, Sergeant Ward conducted a second interview with the Appellant which was also recorded (*id.* at 150). Although the knife used in the

assault was never located, both the baseball cap and the knife sheath found at the scene were sent to the DPS lab for testing (*id.* at 49). The DPS lab confirmed that the Appellant's DNA was on both items (*id.*).

## STATE'S RESPONSE TO APPELLANT'S FIRST POINT OF ERROR

### *Summary of the Argument*

In his first point of error, Appellant argues that the trial court abused its discretion by admitting the Appellant's video recorded statement to Sergeant Ward from January 19, 2012 (Appellant's Brief at 12). In furtherance of his argument, Appellant asserts that video recording does not meet the requirements of Article 38.22 of the Texas Code of Criminal Procedure on the actual video recording admitted into evidence (*id.* at 21). The Appellant concedes that two recordings were produced from the officer's encounter with the Appellant on January 19, 2012, one of which is an audio recording that contains the proper instructions (*id.*). However the Appellant argues that these recordings should be construed as two separate interviews rather than one continual interview because the Appellant was intoxicated at the time of the interview, fell asleep prior to Sergeant Ward's arrival, and approximately 45 minutes passed between the two sessions (*id.*). Appellant's argument that these recordings should be construed as two separate interviews

11

misconstrues the evidence presented and ignores several important facts that support the court's decision to treat the transaction as one continuous interview.

**Facts Pertinent to the 38.22 Warnings**

On January 19, 2012 the Appellant was arrested for the offense of evading arrest or detention and was taken to the Comal County Sherriff's Office (IV R.R. at 101-102). At the time of his arrest, the Appellant was the suspect in the murder investigation regarding the death of Thomas Kitto (*id.* at 116). Following the arrest for evading arrest or detention, Detective Rex Campbell went to the Comal County Sheriff's Office to meet with the Appellant (*id.*). Before going into the interview room where the Appellant was held, Detective Campbell placed a DVD into the video recording system and activated the audio recorder that he kept in his shirt pocket (*id.* at 123). Detective Campbell made his first contact with the Appellant at approximately 10:40 p.m. on January 19, 2012 (I Supp. II R.R. at 32). Once he made contact with the Appellant, Detective Campbell took a series of photos of the Appellant as he appeared there in the interview room (*id.*). Detective Campbell did not interview the Appellant regarding his involvement in the murder because he did not know the details of the ongoing investigation (*id.* at 16-17). Detective Campbell's function was merely to read the Appellant his required

12

warnings and babysit him until Sergeant Ward could arrive to conduct the interview (*id.* at 18).

Detective Campbell first read the Appellant his required warnings at approximately 10:48 p.m. (I Supp. I C.R. at 5-8). The Appellant and Detective Campbell then discussed the Appellant's level of intoxication before Detective Campbell read the statutory warnings to the Appellant a second time at approximately 11:00 p.m. (I Supp. II R.R. at 28). Detective Campbell also explicitly told the Appellant that he would not be questioning him and that a second detective was on the way to perform the interview (VIII R.R. State's Ex. 72). Each time the Appellant indicated that he understood the warnings; after the second reading, the Appellant signed a written waiver form (I Supp. II R.R. at 28). At approximately 11:20 Detective Campbell stepped into the crime analyst office and turned off his audio recorder (*id.* at 33). After leaving the crime analyst office, Detective Campbell noticed that the video recording equipment had malfunctioned and ejected the disk inside (*id.*). Detective Campbell restarted the video recording system and continued to wait for Sergeant Ward to arrive (*id.*). When Sergeant Ward arrived at the Sheriff's Office, he verified with Detective Campbell that the Appellant had been read his rights and wished to waive those rights (*id.* at 44). At approximately 11:55 Sergeant Ward entered the interview room with Detective Campbell and started his interview of the Appellant (*id.* at 34). Although the

warnings given by Detective Campbell and the interview conducted by Sergeant Ward were recorded on two different exhibits, less than an hour passed between the warnings and the interview, the Appellant never changed rooms, and Detective Campbell remained present with the Appellant throughout his questioning.

A pre-trial hearing was held on February 18, 2014 regarding the Appellant's motion to suppress the video-recorded statement from January 19, 2012 (I Supp. II R.R. at 1). Following that hearing, the court denied in part the Appellant's motion to suppress and entered written findings of fact and conclusions of law (I Supp. I C.R. at 5-8). Specifically, the trial court made the following findings of fact:

- That Detective Campbell recorded his initial contact with the Appellant via an audio recording device;
- That Detective Campbell read the Appellant his statutory warnings in accordance with Article 38.22 of the Texas Code of Criminal Procedure;
- That the Appellant clearly indicated that he understood his rights and clearly expressed a desire to waive those rights;
- That Detective Campbell explicitly advised the Appellant that a different officer would conduct the interview;
- That Detective Campbell read the Appellant his statutory warnings in accordance with Article 38.22 of the Texas Code of Criminal Procedure a second time;
- That the Appellant twice clearly indicated that he understood his rights and twice indicated that he desired to waive those rights;
- That both sets of warnings administered by Detective Campbell were electronically recorded in an audio format consistent with the requirements of Article 38.22 of the Texas Code of Criminal Procedure;
- That Sergeant Ward conducted his interview of the Appellant less than an hour after the second set of warnings were administered;
- That Sergeant Ward's entire interview was electronically recorded;

14

- That the Appellant's interview was conducted in the same room where he had been read his warnings;
- That Detective Campbell remained with the Appellant throughout his contact with Sergeant Ward;
- That both the recording with the 38.22 warnings and the recording of Sergeant Ward's contact with the Appellant were part of the same interview;
- That the Appellant demonstrated control of his mental and physical faculties throughout the interview and demonstrated an understanding of both his circumstances and the consequences of his decisions; and
- That the Appellant was not rendered incapable of making an independent informed decision to confess ( I Supp. I C.R. at 5-8).

At trial, the Appellant requested certain redactions be made to both the first part of the interview with Detective Campbell and the second part of the interview with Sergeant Ward (III R.R. at 231-243). The trial court heard each objection and each request for redaction from the Appellant (III R.R. at 231-243). Ultimately, the State was ordered to make several redactions in favor of the Appellant (III R.R. at 231-243). Then, during Detective Campbell's testimony, the State offered the audio recording of Detective Campbell's contact with the Appellant (IV R.R. at 124-126). The Appellant verified that the redactions had been made, asked the court for a limiting instruction whereby the jury was directed not to speculate about the nature of the redactions, and then asserted "No objection" to the admission of that exhibit (IV R.R. at 124-126). Thereafter, during the testimony of Sergeant Ward, the State offered the video recording of Sergeant Ward's contact with the Appellant (IV R.R. at 144). The Appellant stated "We have no objection. We

15

would just like the same limiting instruction from before regarding the redacted portions" (IV R.R. at 146). As such, both recordings were admitted as redacted without objection.

**Waiver**

The issue of whether an assertion of "no objection" will waive previously preserved error is context dependent. *Thomas v. State,* 408 S.W.3d 877, 885 (Tex. Crim. App. 2013). If the entirety of the record plainly demonstrates that the Appellant did not intend to abandon his previously preserved claim and the trial court did not construe his statement of "no objection" as an abandonment of that claim, then the issue should not be considered waived (*id*.) However, if it cannot be determined from the record whether abandonment was intended or construed, then the statement of "no objection" should be construed in a manner consistent with prior case law to affirmatively waive previously preserved claims of error (*id*.). In those situations where it is not explicitly clear from the record, the statement of "no objection" serves as an unequivocal indication that a waiver was both intended and understood (*id.)*.

In the present case there is nothing within the entirety of the record to demonstrate that the Appellant did not intend to waive his previously preserved claim of error regarding the admission of his recorded interview with Sergeant

16

Ward. The Appellant correctly asserts that defense counsel engaged in a vigorous cross-examination of Sergeant Ward regarding the deficiencies in his investigation. However, cross-examination regarding the deficiencies in an investigation can hardly be held to plainly demonstrate that the Appellant did not intend to waive his previously preserved claim of error. In fact, there is nothing at all in the record that would in any way indicate that the Appellant did not intend to waive that previously preserved error.

There is however, a very good reason evident within the record that the Appellant would have chosen to waive his previously preserved error. Following the pre-trial hearing on the Appellant's motion to suppress, the trial court ordered that the video recording of Sergeant Ward's January 19, 2012 interview would be redacted from the 26:03 mark forward (I Supp. I C.R. at 5-8). Thereafter, at trial, the Appellant requested a multitude of redactions – most of which were contested by the State – and nearly all of which the court ordered redacted in the Appellant's favor (III R.R. at 231-243). The exhibit that was offered at trial contained the numerous redactions sought by the Appellant and ordered by the trial court (IV R.R. at 144). When this exhibit was offered, the Appellant sought to ensure that the redactions were properly made, requested that the jury be given a limiting instruction ordering them not to speculate about the contents of redactions, and unequivocally stated that there was no objection (IV R.R. at 146).

17

Our law directs us to conduct a context-dependent review of the circumstances of cases in which the words "no objection" are uttered prior to the admission of previously objected-to evidence. The particular context of this case is such that, because of numerous defense-friendly redactions, the exhibit offered at trial was very different from the exhibit objected to pre-trial. No objection was made to the exhibit as redacted and the Appellant cannot plainly demonstrate from the record that he did not intend to waive previously preserved error or that the trial court did not construe counsel's statements as a waiver of previously preserved error.

**Standard of Review**

A trial court's ruling on a motion to suppress is reviewed under an abuse of discretion standard and the trial court's ruling will not be disturbed so long as it is within the zone of reasonable disagreement. *Martinez v. State,* 348 S.W.3d 919, 929 (Tex. Crim. App. 2011); *Crain v. State,* 315 S.W.3d 43, 48 (Tex. Crim. App. 2010). In determining whether an abuse of discretion occurred, a bifurcated standard is applied which gives almost total deference to a trial court's determination of facts and reviews de novo the trial court's application of the law to those facts. *Wilson v. State,* 311 S.W.3d 452, 457-58 (Tex. Crim. App. 2010). Ultimately, if a trial court's determination is supported by the record and correct

under any applicable theory of law, then the reviewing court will not disturb the trial court's ruling. *Young v. State,* 283 S.W.3d 854, 873 (Tex. Crim. App. 2009). The court in this case denied the motion to suppress in part, eventually ordering multiple redactions in the Appellant's favor, before ruling the evidence admissible under Article 38.22 of the Texas Code of Criminal Procedure. The trial court's decision was supported by the record and correct as a matter of law.

## Authorities Regarding 38.22

Article 38.22 of the Texas Code of Criminal Procedure governs the use of an oral statement made by a defendant during the course of a custodial interrogation. TEX. CRIM. PROC. CODE art. 38.22. This article requires that, in order for such a statement to be admissible against a defendant, both the requisite statutory warnings and the defendant's statement itself must be electronically recorded (*id.*). There is no requirement that the warnings and the defendant's statement must be on the same recording. In fact, our law recognizes that there are many situations in which warnings are given, a break ensues, and then questioning resumes without new warnings. *Hayes v. State,* 05-11-00260-CR, 2013 WL 1614108 (Tex. App.—Dallas Feb. 19, 2013, no pet.) (not designated for publication). In these situations, if the totality of the circumstances indicates that the second interview is essentially a continuation of the first interview, then the warnings previously given remain

19

effective during the second phase of that same interview. *Id*. In 2005, the court rendered an opinion in *Bible v. State* which set out four factors to consider when determining whether or not separate sessions constitute a single, continuing interview. 162 S.W.3d 234, 242 (Tex. Crim. App. 2005). The four factors set out in *Bible* were 1) the passage of time, 2) whether the second session was conducted by a different person, 3) whether the second session related to a different offense, and 4) whether the officer asked if the defendant remembered the prior warnings and still wished to waive his rights. *Id.* In applying this four-part test, the court in *Bible* explicitly referenced the cases of *Franks v. State* (1986) and *Ex Parte Bagley* (1974) as relevant guides. *Id*.

In the *Franks* case, the suspect was read his warnings and subjected to custodial interrogation at approximately 11:50 a.m. *Franks v. State,* 712 S.W.2d 858, 860-61 (Tex. App.—Houston, 1986, pet ref'd). Officers left, continued their investigation by interviewing several other witnesses, and then returned around 4:00 p.m. to re-interview the suspect. *Id*. When they returned at 4:00 p.m. a different officer asked the defendant if he remembered his rights and then questioned the defendant without providing new warnings. *Id*. The court found that – despite a break of more than four hours and a change in officers conducting the interview – both of these sessions constituted a single interview and that there was no need for a second set of warnings. *Id*. In the *Bagley* case, the defendant gave a

20

written confession after being fully warned of his rights. *Ex Parte Bagley,* 509 S.W.2d 332, 335 (Tex. Crim. App. 1974). Six to eight hours later officers returned and re-interviewed the defendant. *Id*. Although the warnings were re-read to the defendant prior to the second session, the court found that fact immaterial because the statement was already fully admissible based on the warnings given six to eight hours earlier during this single interrupted interview. *Id*. at 337.

In the *Bible* case an even more egregious fact scenario still supported admission of the statement. *Bible* 162 S.W.3d at 238. The facts in *Bible* indicated that a detective in Louisiana met with a suspect who was in custody in Baton Rouge. *Id*. During the first session with the defendant, the Louisiana detective read the defendant his rights and interviewed him concerning a murder that had occurred in Louisiana. *Id*. Approximately three hours after that interview, the detective returned with a Louisiana State Trooper. *Id*. The Trooper asked the defendant if he remembered his rights and still wanted to talk to the officers. *Id*. The defendant answered in the affirmative and the Trooper proceeded to question him regarding a series of murders that had occurred in Palo Pinto County, Texas. *Id*. Despite the fact that the interviews were separated by approximately three hours, conducted by different officers, and focused on different offenses, the court held that both sessions still constituted a single interview. *Id.* at 241. The *Bible* case is the primary authority on what factors should be considered in determining

whether two interview sessions constitute a single interview and serves as a useful example for applying those factors.

**Argument Regarding the *Bible* Factors**

In the case at bar, the Appellant was taken to an interview room where he was read his rights twice by Detective Campbell. Thereafter, Detective Campbell does not question the Appellant, but explicitly tells the Appellant that they are waiting on another officer who is en route to conduct the interview. Sergeant Ward arrived less than an hour after Detective Campbell finished reading the Appellant his rights for the second time and started the interview. Detective Campbell remained in the room with both the Appellant and Sergeant Ward while the Appellant was questioned about the murder of Thomas Kitto.

With regard to the first *Bible* factor, less than an hour elapsed between the end of the warnings and the start of Sergeant Ward's interview with the Appellant. This factor weighs heavily in the State's favor in light of cases such as *Bible* (where there was a three-hour break in the questioning) or *Bagley* (where there was a six- to eight-hour break in questioning). *Bible*, 162 S.W.3d at 237; *Bagley*, 509 S.W.2d at 333. The Appellant would urge the Court to consider this break of under an hour to be an inordinate amount of time because of the Appellant's purported state of intoxication. This argument has no basis in either fact or law.

22

From a purely factual perspective, the Appellant did admit to consuming alcohol on the night in question. However, Sergeant Ward described the Appellant as a functional alcoholic whom he had never seen completely sober (I Supp. II R.R. at 43). Ultimately, neither Detective Campbell nor Sergeant Ward had any real reservations about the Appellant's ability to freely and voluntarily waive his rights and give a statement (I Supp. II R.R. at 32 and I Supp. II R.R. at 43). The trial court agreed and rendered explicit written findings of fact holding that 1) the Appellant displayed the ability to discuss multiple different subjects and past events during his contact with the officers; 2) the Appellant demonstrated control over his mental and physical faculties throughout his contact with the officers; 3) the Appellant demonstrated an understanding of his circumstances and the consequences of his actions throughout the duration of his contact with officers, even at one point reasoning aloud that it would be better for his case to give a statement; and 4) the Appellant was not rendered incapable of making an independent, informed decision to confess during his contact with officers (I Supp. I C.R. at 5-8).

There was nothing about the Appellant's state of mind that should be construed to inflate the period of time between the two sessions to such a degree that these sessions constituted two separate interviews. The delay was far less than

23

that seen in *Bible, Bagley,* and many other cases.  Therefore, the first *Bible* factor is squarely in the State's favor.

With regard to the second factor, whether the subsequent interview was conducted by a different officer, the State would contend that this factor also weighs in the State's favor because the Appellant was not actually interviewed by Detective Campbell. The audiotape recording and Detective Campbell's testimony indicate that he did nothing more than read the Appellant his rights, inform the Appellant that a different officer was en route to question the Appellant, and then "babysit" the Appellant for almost an hour until Sergeant Ward arrived.  As such, Detective Campbell did not interview the Appellant for the purposes of Article 38.22.  Therefore the second *Bible* factor should weigh in the State's favor, as Sergeant Ward was the only officer to conduct a custodial interrogation of the Appellant.  If, however, the Court were to determine that Detective Campbell did question the Appellant for the purposes of Article 38.22 and that Sergeant Ward represented a second, different interviewer, then the State would argue that this factor should be minimized in the evaluation of the *Bible* factors.  The overarching question is whether the totality of the circumstances indicates that these two sessions were a single interview.  Detective Campbell clearly communicated to the Appellant that they were waiting for another officer who would conduct the interview, and as such, the change in officers questioning the Appellant would be

24

minimal because that change was anticipated and communicated to the Appellant, and Detective Campbell remained in the room during the questioning by Sergeant Ward.

The third *Bible* factor would focus the court's attention to whether a different offense was the subject of the subsequent interrogation. With regard to this factor, the State would first advance the same argument that was expressed with regard to the second *Bible* factor. During Detective Campbell's time with the Appellant, Detective Campbell made small talk and asked the Appellant what he had been up to. The Appellant then guided the conversation towards the offenses of evading arrest and driving while intoxicated. Although Detective Campbell does advance some follow-up questions, there is no real interrogation as to those offenses. Furthermore, the entirety of that conversation is framed within the context of the Appellant being told that another officer is on his way to conduct the actual interview. There is only one offense about which the Appellant was actually questioned – the murder offense that was the subject of Sergeant Ward's questioning. If, however, the Court determines that the conversation between Detective Campbell and the Appellant did constitute questioning regarding a different offense, the State would argue that this factor should be minimized in the Court's evaluation of the *Bible* factors, because that questioning occurred only

within the context of small talk carried out while waiting for another officer to arrive and conduct a full interview.

In the fourth *Bible* factor, the Court must examine whether the Appellant was reminded of his rights and whether he was asked if he still wished to give a voluntary statement. The evidence in this case indicates that Sergeant Ward did not remind the Appellant of his rights and did not ask him if he still wanted to waive those rights whenever he arrived to interview the Appellant. However, in this particular case, a reminder should not be necessary because the Appellant, at the time of his warnings, was explicitly told by Detective Campbell that a second officer would arrive later and conduct his interview. After being so informed, the Appellant indicated he was okay with a different officer conducting the interview and that he wished to give a statement. The Appellant had actual notice from Detective Campbell at the time the warnings were read to him that those warnings would apply to the upcoming interview to be conducted when Sergeant Ward arrived. At the time of those warnings, the Appellant explicitly agreed to give a statement in that very manner. Therefore, there should not be any need for a reminder, because the warnings were read to the Appellant in anticipation of a different officer conducting the questioning.

The ultimate question in applying these *Bible* factors is whether the totality of the circumstances indicated that the two sessions were two separate interviews

26

or one continuous interview. In the present case, an inmate was read his warnings by one officer who explicitly told that inmate that those warnings were to apply to an interview which would be conducted by a different officer who was already on his way and who did arrive to perform the interview in less than an hour. When the Appellant agreed to waive those warnings, he did so under those circumstances and in anticipation of a different officer conducting the interview. The totality of the circumstances clearly indicates that both sessions were part of one single, continuing interview; the necessary warnings under §38.22 of the Texas Code of Criminal Procedure were properly read and recorded and the video recording of the interview was properly admitted into evidence.

## STATE'S RESPONSE TO APPELLANT'S SECOND POINT OF ERROR

### *Summary of the Argument*

In his second point of error, Appellant argues that the trial court abused its discretion by admitting video recorded statement to Sergeant Ward from January 19, 2012. Appellant's Brief at 2. The Appellant argues that the statement was obtained only after the Appellant attempted to terminate the interview and invoke his right to remain silent. *Id.* at 13. In advancing this argument, the Appellant points to five isolated statements without any context for the surrounding

27

conversation and fails to refute the plain waiver of the issue that occurred when State's Exhibit 73 was offered at trial. *Id*. at 17.

**Facts Pertinent to Invocation of Right to Remain Silent**

Prior to his interview on the evening of January 19, 2012, the Appellant was twice read his 38.22 warnings and was explicitly told that a second officer was on his way to question the Appellant (VIII R.R. State's Ex. 72). The Appellant indicated that he understood and that he did want to give a statement because "it would be better for my case" (VIII R.R. State's Ex. 72). When Sergeant Ward arrived, he verified with Detective Campbell that the Appellant had been read the necessary warnings and that the Appellant desired to give a statement (I Supp. II R.R. at 44). Sergeant Ward then entered the room and began his interview of the Appellant (*id.*). Sergeant Ward's interview of the Appellant lasted approximately 35 minutes (I Supp. I C.R. at 5-8).

A pre-trial hearing was held on February 18, 2014, regarding the Appellant's motion to suppress the video recorded statement from January 19, 2012 (I Supp. II R.R. at 1). During the course of this hearing, the Appellant moved to suppress the State's evidence for multiple grounds, including invocation of his right to remain silent (*id.* at 56). The court, having viewed the entirety of the video and heard testimony from both Sergeant Ward and Detective Campbell, requested that each

party brief the issue of invocation of the right to remain silent (*id.*). The Appellant submitted a brief regarding the Appellant's purported invocation of his right to remain silent (I C.R. at 47-53). In the Appellant's brief, the Appellant points to four specific instances where he made statements that he contended were efforts to invoke his right to remain silent (I C.R. at 47-53). The Appellant then quotes a fifth instance, wherein the Appellant stated "Quit talking to me. Take me to jail" and concedes that the first four statements may have some degree of ambiguity, but asserts that the final statement quoted was an unambiguous invocation (I C.R. 47-53). Ultimately, the court agreed with the Appellant regarding that final statement at issue (I Supp. I C.R. at 5-8). Following that hearing, the court entered written findings of fact and conclusions of law, denying in part and granting in part the Appellant's motion to suppress (*id.*). Specifically, the court agreed with Appellant and found that the statement "Quit talking to me. Take me to jail" constituted an invocation of the Appellant's right to remain silent (*id.*). As such, the court ruled that the remaining nine minutes that followed after the invocation of his right to remain silent would be inadmissible (*id.*).

At trial, the Appellant requested certain redactions be made to both the first part of the interview with Detective Campbell and the second part of the interview with Sergeant Ward (III R.R. at 231-243). The trial court heard each objection and each request for redaction from the Appellant (*id.*). The State was ordered to make

several redactions in favor of the Appellant (*id.*). Thereafter, the State agreed to additional requested redactions and ultimately offered a severely redacted version of the interview into evidence at trial (IV R.R. 124-126). This exhibit as redacted ended prior to the Appellant's invocation of his right to remain silent as ordered by the trial court in the pre-trial hearing. Whenever this severely redacted version of the interview was offered into evidence, the Appellant stated "We have no objection. We would just like the same limiting instruction from before regarding the redacted portions" (IV R.R. at 146). The redacted exhibit was then admitted without objection (*id.*).

**Waiver**

Again, the issue of whether an assertion of "no objection" will waive previously preserved error is context dependent. *Thomas,* 408 S.W.3d at 885. If the entirety of the record plainly demonstrates that the Appellant did not intend to abandon his previously preserved claim and the trial court did not construe his statement of "no objection" as an abandonment of that claim, then the issue should not be considered waived. *Id*. However, if it cannot be determined from the record whether abandonment was intended or construed, then the statement of "no objection" should be construed in a manner consistent with prior case law to affirmatively waive previously preserved claims of error. *Id*. In those situations

where it is not explicitly clear from the record, the statement of "no objection" serves as an unequivocal indication that a waiver was both intended and understood. *Id*.

The record is devoid of anything that would indicate the Appellant did not intend to waive his previously preserved claim of error regarding the interview by Sergeant Ward. To the contrary, it is evident from the record that the Appellant did intend to waive his objection. The exhibit offered at trial was very different from the exhibit debated in the pre-trial hearing on the Appellant's motion to suppress. At the court's order the State redacted a vast portion of the exhibit. When this new, redacted version of the video was introduced, the Appellant sought to ensure that the redactions were properly made, requested that the jury be given a limiting instruction ordering them not to speculate about the contents of redactions, and unequivocally stated that there was no objection (IV R.R. at 146).

Our law directs us to conduct a context dependent review of the circumstances of cases in which the words "no objection" are uttered prior to the admission of previously objected to evidence. The particular context of this case is such that, because of numerous defense-friendly redactions, the exhibit offered at trial was very different from the exhibit objected to pre-trial. No objection was made to the exhibit as redacted and the Appellant cannot plainly demonstrate from the record that he did not intend to waive previously preserved error or that the trial

31

court did not construe counsel's statements as a waiver of previously preserved error.

**Standard of Review**

A court's ruling on a motion to suppress is reviewed under an abuse of discretion standard; the trial court's ruling is not to be disturbed so long as it is within the zone of reasonable disagreement. *Martinez,* 348 S.W.3d at 929; *Crain,* 315 S.W.3d at 48. In determining whether an abuse of discretion occurred, a bifurcated standard is applied which gives almost total deference to a trial court's determination of facts and reviews de novo the trial court's application of the law to those facts. *Wilson,* 311 S.W.3d at 457-58. If a trial court's determination is supported by the record and correct under any applicable theory of law, then the reviewing court will not disturb the trial court's ruling. *Young,* 283 S.W.3d at 873. The trial court in this case made a finding that the Appellant asserted his right to remain silent at a particular point in the video recorded interview and entered an order denying admission of any portion of the interview that occurred after that invocation. The trial court's factual findings were supported by the evidence and the conclusions of law reached by the trial court were correct.

32

## Authorities Regarding Invocation of the Right to Remain Silent

The precedent established by *Miranda v. Arizona* and the warnings set out in Article 38.22 of the Texas Code of Criminal Procedure provide that a suspect may cut off questioning and invoke his right to remain silent. TEX. CRIM. PROC. CODE art. 38.22; 384 U.S. 436, 474 (1966). An officer is expected to cut off questioning whenever a suspect unambiguously invokes his right to remain silent. *Ramos v. State,* 245 S.W.3d 410, 418 (Tex. Crim. App. 2008). A suspect's invocation of his right to remain silent is unambiguous whenever the statement is not subject to more than one reasonable interpretation under the circumstances. *Dowthitt v. State,* 931 S.W.3d 244, 257 (Tex. Crim. App. 1996). The United States Supreme Court and the Texas Court of Criminal Appeals have recognized that whenever a suspect makes a statement that is in some way ambiguous or equivocal, officers may – but are not required to – question the suspect to clarify his intention. *Davis v. U.S.,* 512 U.S. 452, 458 (1995); *Marshall v. State* 210 S.W.3d 618, 682 (Tex. Crim. App. 2006). An individual being questioned may waive his right to remain silent either expressly or implicitly by his conduct. *Berghuis v. Thompkins,* 560 U.S. 370, 380-81 (2010). Following a declaration of a desire to terminate questioning, an officer may not continue questioning the suspect until the officer "succeeds in persuading the suspect to change his mind

33

and talk." *Kupferer v. State* 408 S.W.3d 485, 489 (Tex.App. – Houston 2013, pet. ref'd) (citing *Dowthitt,* 931 S.W.3d at 257).

**Argument Regarding Invocation of the Right to Remain Silent**

The statements made by the Appellant during the course of his interview with Sergeant Ward were ambiguous and fall well short of the clarity needed for a suspect to invoke his right to remain silent. State's Exhibit 73, which was admitted at trial in a severely redacted form with objection from the defense, contained the interview of the Appellant that Sergeant Ward conducted on the night of January 19, 2012 (VIII R.R. State's Ex. 73).

The interview that was conducted on the evening of January 19, 2012 started off with the Appellant lying to Sergeant Ward multiple times about his whereabouts on the evening in question (*id.*). About twenty minutes into State's Exhibit 73, Sergeant Ward confronts the Appellant directly about his repeated lies (*id.)*. In response to that confrontation, the Appellant exclaims, "You're right. I'm done" (*id.*). In the context of the conversation, this statement seemed to indicate that the Appellant was done lying to Sergeant Ward about the events of the evening, not that the Appellant wished to terminate the interview. This statement is at best ambiguous and certainly contains insufficient clarity to be considered an invocation of the Appellant's right to remain silent. That ambiguity is heightened

34

by the Appellant's conduct after making that statement. Following his exclamation that he is done, the Appellant begins to re-describe the events of that evening and endeavors to explain his side of the story (*id.*). The Appellant's fresh account ends with him stating "And now you're going to charge me with Aggravated Assault" (*id.*). Sergeant Ward then informs the Appellant that his victim has died (*id.*). The Appellant has a rather intense reaction to learning that the Appellant has died and becomes visibly upset (*id.*). While trying to comprehend this new information, the following exchange occurs between Sergeant Ward and the Appellant:

**Appellant**: Just take me to my cell, man. (1:34)
**Sergeant**: Let's talk about it for a minute man. (1:35)
**Appellant**: No. I'm not telling you nothing more. (1:36)
**Appellant**: I didn't know the man was dead. (1:38)
**Appellant**: What the fuck man. (1:39)

(VIII R.R. State's Ex. 73 – time stamps are based on State's Ex. 73 as submitted in VIII R.R. State's Ex. 73, not as the exhibit was played for the jury).

For the next fifteen seconds, the Appellant wrestled with the news that the victim had died (*id.*). Despite asking to be taken back to his cell, the Appellant kept talking (*id.*). Rather than question or interrupt the Appellant, Sergeant Ward gave him time to think about his situation (*id.*). The Appellant appeared to desire to speak further and after a moment, without solicitation, the Appellant continued:

**Appellant**: Man. (1:54)
**Appellant**: Fuck dude. (1:55)
**Appellant**: Nu uh dude, he ain't dead. (2:04)

35

**Sergeant**: Ya Eric, he is. (2:06)
**Appellant**: Really? (2:07)
**Sergeant**: Ya Eric. You know that guy? (2:09)
**Appellant**: I never met the motherfucker in my life. Dude, I don't know who that fucking dude was. (2:12)

(VIII R.R. State's Ex. 73 – time stamps are based on State's Ex. 73 as submitted in VIII R.R. State's Ex. 73, not as the exhibit was played for the jury). Then the Appellant, without solicitation from Sergeant Ward, described a fresh account of the events that lead to the death of Thomas Kitto (*id.*).

After the Appellant finishes explaining this account, Sergeant Ward begins to question the Appellant about the knife he carried and the shirt he wore (*id.*). When Sergeant Ward approached that topic, the Appellant responded as follows:

**Sergeant**: Okay, you told me you had a black shirt on and some blue jeans. (2:53)
**Appellant**: I'm done. (2:54)
**Sergeant**: Let's, let's talk about something other than that. Let's talk about what you had on. (2:59)
**Appellant**: I don't know. (3:01) (almost inaudible)
**Sergeant**: Ok. When you left there, where did you go. (3:05)
**Appellant**: Home. (3:06)

(VIII R.R. State's Ex. 73 – time stamps are based on State's Ex. 73 as submitted in VIII R.R. State's Ex. 73, not as the exhibit was played for the jury).

As the conversation continues, the Appellant and Sergeant Ward discuss the Appellant's actions after leaving the Canyon Falls RV Park and the disposition of the knife used to kill Thomas Kitto (*id.*). A few minutes later, at approximately

5:08 on State's trial exhibit 73 as submitted to the court, the Appellant says "Don't talk to me, just take me to my cell now" (*id.*). Thereafter, Sergeant Ward attempts to clarify whether the Appellant really wants to discontinue the interview, before ultimately continuing to discuss the incident openly (*id.*). Following the Pre-trial hearing on the Appellant's Motion to Suppress, the trial court judge ultimately ruled that the Appellant invoked his right to remain silent with the statement described at 5:08 on State's trial exhibit 73 as submitted to the court and determined that everything after that point was inadmissible (I Supp. I C.R. at 5-8). As such, nothing beyond the invocation at 5:08 on State's Trial exhibit 73 as submitted to the court was played for the jury (VIII R.R. State's Ex. 73).

The Appellant cites to three specific statements within State's trial exhibit 73 that he contends represent an invocation of the right to remain silent. Appellant's Brief at 26. These specific statements and the contextual conversation are outlined above from 1:34 to 1:39, 2:53 to 3:06, and at 5:08 on State's trial exhibit 73 as the exhibit was submitted to the court, but not as it was played to the jury (VIII R.R. State's Ex. 73). As the trial court agreed with the Appellant regarding the statement made at 5:08, no further analysis is warranted. With respect to the other two statements, the context of each of those conversations indicates assertions that are ambiguous at best. Therefore the trial court committed no error in admitting State's trial exhibit 73 without objection.

Regarding the conversation that occurred, as submitted to the court, from 1:34 to 1:39, the Appellant stated that he wanted to be taken to his cell and that he did not wish to say anything further. However, he then continued speaking to Sergeant Ward without prompting or solicitation. The Appellant actually continues the conversation by questioning Sergeant Ward regarding his victim's fate. The conduct of the Appellant after making his statement, particularly the Appellant's unsolicited questioning of the Sergeant, makes for extremely important contextual evidence which aids in the evaluation of the Appellant's actual desire to continue the interview. When viewed in proper context, it appears quite clear that the Appellant desired to continue speaking with Sergeant Ward and that he continued the interview to both ascertain his victim's fate and provide his version of the events. There is no invocation such that the remainder of the interview should be held inadmissible.

A similar analysis is appropriate for the portion of the conversation that occurred from 2:53 to 3:06 as submitted to the court on State's Trial exhibit 73. During this exchange, Sergeant Ward attempts to turn the conversation towards the disposition of the knife used in the killing of Thomas Kitto and the shirt that the Appellant was wearing at the time. The Appellant becomes guarded and tells Sergeant Ward that he is "done," at which point Sergeant Ward redirects the conversation to a different area of discussion. The Appellant then engages with

Sergeant Ward in discussing where he went after the incident and eventually discloses that he threw the knife used to kill Thomas Kitto into Sorrell Creek (*id.*). The totality of the circumstances indicates that Sergeant Ward took the Appellant's statements to mean that he was done discussing the knife and his clothing. This statement caused Sergeant Ward to redirect towards another area of discussion. The Appellant engages with Sergeant Ward in that discussion, indicating that Sergeant Ward correctly apprised the situation and the Appellant's desire to talk about something else. At no point did the Appellant unambiguously invoke his right to remain silent. The trial court did not error in admitting State's trial exhibit 73 as redacted and without objection.

## STATE'S RESPONSE TO APPELLANT'S THIRD POINT OF ERROR

### *Summary of the Argument*

In his third point of error, Appellant argues that the evidence produced at trial was insufficient to prove that the Appellant tampered with physical evidence with knowledge that an investigation was pending or in progress, or that an offense had been committed. Appellant's Brief at 28. In advancing this point, the Appellant asserts that the evidence is insufficient to prove that, at the time he tampered with the knife, he knew an investigation was pending or in progress or that a crime had been committed. Appellant's Brief at 29-31. However, this

39

assertion ignores a great wealth of evidence from the scene of the crime, the Appellant's encounter with law enforcement after the slaying, and the Appellant's statement to law enforcement which demonstrated that the Appellant did possess the requisite culpable mental state when he disposed of the knife used to kill Thomas Kitto.

**Facts Relevant to Legal Sufficiency**

As the parties chased a dog around the campground, Ms. Hebert looked towards the Appellant and saw him pull a fixed-blade knife from his hip (III R.R. at 66-71). Ms. Hebert turned her back to put up the dog, but when she turned around, she saw that Mr. Kitto had suffered a serious stab wound (*id.* at 72). As the Appellant scrambled to his feet, he struggled to pick up something that he had dropped (*id.* at 70-72). Once on his feet, the Appellant went to his car and took off, turning into the main area of the campground (*id.* at 74). The Appellant then turned around inside the park and returned in front of the cabins to exit out onto the highway (*id.*). As the Appellant passed the cabins to reach the highway, multiple bystanders tried to flag the Appellant down and get him to stop, however, the Appellant continued onto the highway and left the scene (*id.* at 75).

Deputies with the Comal County Sheriff's office responded, secured the scene, and began taking statements (*id.* at 174). On the ground near the body of

40

Mr. Kitto, deputies found a baseball cap and the sheath for a fixed-blade knife (*id.* at 186-189). Later that evening, Deputy Koepp found the Appellant driving a green pickup truck near his residence (IV R.R. at 86). Deputy Koepp initiated a traffic stop and the vehicle eventually came to a stop in a nearby driveway (*id.* at 88). Deputy Koepp ordered the Appellant to place his hands on the squad car (*id.* at 89). The Appellant appeared compliant with the deputy's commands and walked towards the squad car with his hands in the air; however, when Deputy Koepp lowered his taser and reached for his handcuffs, the Appellant exclaimed "Fuck that. I'm not going back" and tried to run away (*id.*). Deputy Koepp pursued the Appellant, tackled him in the road, and dragged him back to the squad car where he was secured in hand cuffs (*id.* at 89-91).

Sergeant Ward interviewed the Appellant about the death of Mr. Kitto (III R.R. at 50). During the course of this interview, the Appellant admits to stabbing Mr. Kitto with a knife that the Appellant kept in a sheath in his back pocket (VIII R.R. State's Ex. 73). The Appellant characterizes his actions as "the wrong thing to do," states that he "feels like there was some fault there," and surmises that the Sheriff's Office now has him for "aggravated assault" (*id.*). The Appellant further stated during the interview that he lost the sheath to the knife, that the sheath he lost did not actually belong to the knife he used to kill Mr. Kitto, and that he threw the knife into Sorrell Creek (*id.*). Based on the assertions made during the

41

interview with the Appellant, Sergeant Ward secured a search warrant for the Appellant's residence and sent multiple deputies to search Sorrell Creek for the knife used in the assault (IV R.R. at 148-49). Deputies were not able to locate the knife in Sorrell Creek (*id.* at 149). Although the knife used in the assault was never located, both the baseball cap and the knife sheath found at the scene were sent to the DPS lab for testing which confirmed that the Appellant's DNA was on both items (*id.*).

**Authorities on Legal Sufficiency**

After the decision of the Court of Criminal Appeals in *Brooks v. State*, Texas appellate courts review legal and factual sufficiency challenges in criminal cases using the same legal sufficiency standard of review. *Kiffe v. State*, 361 S.W.3d 104, 107 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd). Evidence is only insufficient if, when considering all the evidence in the light most favorable to the verdict, "no rational factfinder could have found each essential element of the charged offense beyond a reasonable doubt." *Id*. (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). While viewing the evidence in the light most favorable to the verdict, evidence can be insufficient in two circumstances: when the record contains "no evidence, or merely a 'modicum' of evidence, probative of an element of the offense" **or** when "the evidence conclusively establishes a

42

reasonable doubt." *Id*. The evidence may also be insufficient when the acts alleged do not constitute the offense charged (*Id*. at 108).

Legal sufficiency review "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson v. Virginia*, 443 U.S. at 319. Reviewing courts determine whether the necessary inferences are reasonable based on the "combined and cumulative force of the evidence when viewed in the light most favorable to the verdict." *Kiffe*, 361 S.W.3d at 108.

Courts will treat direct and circumstantial evidence equally (*Id*.). "Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt." (*Id*.). Appellate courts will presume that the factfinder "resolved any conflicting inferences in favor of the verdict" and defer to that resolution (*Id.*). The reviewing courts will also defer to "the factfinder's evaluation of the credibility and the weight of the evidence." (*Id.*). The factfinder is entitled to accept some testimony and reject other testimony, in whole or in part. *Margraves v. State*, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000), *abrogated on other grounds by Laster v. State*, 275 S.W.3d 512 (Tex. Crim. App. 2009). In reviewing the sufficiency of the evidence:

> Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative effect of all the incriminating

43

facts are sufficient to support the conviction. Motive is a significant circumstance indicating guilt. Intent may also be inferred from circumstantial evidence such as acts, words, and the conduct of the appellant.

*Guevara v. State*, 152 S.W.3d 45, 49-50 (Tex. Crim. App. 2004) (internal citations omitted).

**Argument on Legal Sufficiency**

The Texas penal code provides multiple different means by which one may commit the offense of tampering with physical evidence. Section 37.09(a)(1) states that a person commits the offense of tampering with physical evidence if, knowing that an investigation or official proceeding is pending or in progress, he alters, destroys or conceals any record, document, or thing with intent to impair its verity, legibility, or availability as evidence in the investigation or official proceeding. TEX. PENAL CODE ANN. §37.09. The manner of tampering with physical evidence set out in 37.09(a)(1) is charged by Count II Paragraph A of the indictment in this cause (I C.R. 8-9).

Section 37.09(d)(1) states that a person commits the offense of tampering with physical evidence if the person, knowing that an offense has been committed alters, destroys, or conceals any record, document, or thing, with intent to impair its verity, legibility, or availability as evidence in any subsequent investigation of

or official proceeding related to the offense. TEX. PENAL CODE ANN. §37.09. The manner of tampering with physical evidence set out in 37.09(d)(1) is charged by Count II Paragraph B of the indictment in this cause (*Id.*).

Each of these two manners of committing tampering with physical evidence were correctly indicted in this cause, and both manners were correctly submitted in the alternative to the jury in the charge of the court. Neither § 37.09(a)(1) nor § 37.09(d)(1) requires the State to prove the commission of some specific underlying criminal offense. TEX. PENAL CODE ANN. § 37.09.

Section 37.09(a)(1) of the Texas Penal Code requires that an investigation or official proceeding be pending or in progress, but does not require that investigation or proceeding to result in criminal charges or a conviction for a criminal offense. TEX. PENAL CODE ANN. §37.09. The term "pending" has a unique usage in this statute suggesting the proper meaning as "impending" or "about to take place." *Lumpkin v. State,* 129 S.W.3d 659, 663 (Tex.App. – Houston [1st Dist] 2004, pet. ref'd). Pursuant to that interpretation, there are a variety of scenarios wherein an individual may be said to know that an investigation or official proceeding is pending. This is especially true whenever someone has died as a result of the defendant's actions. The Third Court of Appeals recently took up such a case and determined that a defendant who concealed a corpse was "…certainly aware that the victim had died and that an investigation into her

45

disappearance was impending or about to take place." *Briscoe v. State,* 03-11-00014-CR, 2013 WL 4822878, at *6-7 (Tex. App.—Austin Aug. 29, 2013, no pet.) (not designated for publication). In that particular case, a man had hired a prostitute to come to his home, choked her, and buried her body in a remote location. *Id.* Although that particular defendant was convicted of both murder and tampering with physical evidence, the evidence produced at trial indicated that the victim may have actually died from the ingestion of cocaine rather than the defendant's actions. *Id.* In determining whether there was legal sufficiency to sustain the conviction for tampering with physical evidence, the court conducted a separate evaluation of the tampering with physical evidence charge and concluded that the defendant did commit the act of tampering while knowing that an investigation was pending. *Id.*

When this theory is applied to the Appellant's case, it is clear that he knew someone had been stabbed as a result of his actions. From that, the Appellant would necessarily have known that an investigation into that stabbing would certainly take place; he therefore knew an investigation was impending or about to take place, as in Briscoe. *See id.* Beyond that, the evidence produced at trial during Ms. Hebert's testimony was that bystanders tried to flag the Appellant down and get him to stop as he left the campground. Furthermore, during his apprehension as the officer reached for his handcuffs, the Appellant fled arrest on foot, saying

"Fuck that. I'm not going back." This conduct occurred after Deputy Koepp had no more than pulled him over and asked him to put his hands on the hood of his car. Further, during his subsequent interview, Appellant lied to Sergeant Ward multiple times about where he had been that evening – eventually admitting that he had "poked" the victim and stating that he committed aggravated assault – before ultimately telling Sergeant Ward that he had thrown the knife into Sorrell Creek. The conduct of fleeing the scene as bystanders tried to flag him down, running from Deputy Koepp when he was pulled over, lying about going to the Canyon Falls RV Park and telling Sergeant Ward that he used the knife to stab the victim are all items of evidence that tend to indicate the Appellant knew an investigation into his stabbing of Thomas Kitto was pending or in progress.

Section 37.09(d)(1) does require the existence of some criminal offense, however, the State is not required to prove what criminal offense had been committed. TEX. PENAL CODE ANN. § 37.09. As such, the jury was required to find that the Appellant had committed some offense, but not necessarily the offense of murder. Conceivably, the jury could have concluded that the Appellant had committed the offense of manslaughter, assault with a deadly weapon, or even simple assault, any of which would have allowed for a conviction on tampering with physical evidence in the absence of guilty on the charge of murder. The only requirement is that the jury believe the Appellant, knowing that **an offense** had

47

been committed, acted to destroy, alter, or conceal a knife to impair its verity, legibility, or availability as evidence in subsequent investigations or proceedings. In this particular case, the Appellant went so far as to tell Sergeant Ward that he had committed Aggravated Assault, that "he did not think it was the right thing to do," and that "there was some fault there" (VIII R.R. State's Ex. 73).

The fact that the Appellant was found "Not Guilty" of the offense of murder does not mean that no criminal offense had been committed. This type of argument would focus on the phenomenon of inconsistent verdicts. Writing the opinion for the Court in *Dunn v. United States*, Justice Holmes stated "Consistency in the verdict is not necessary." 284 U.S. 390, 393 (1932). Justice Holmes then quoted from the 2nd Circuit:

> The most that can be said in such cases is that the verdict shows that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt. We interpret the acquittal as no more than their assumption of a power which they had no right to exercise, but to which they were disposed through lenity.

*Id.* (quoting from *Steckler v. United Sates,* 7 F2d 59, 60 (2d Cir. 1925)). Justice Holmes concluded by writing, "That the verdict may have been the result of compromise, or of a mistake on the part of the jury, is possible. But verdicts cannot be upset by speculation or inquiry into such matters." *Id.* at 394. It is no more likely that the jury erred in convicting the Appellant of tampering with

48

physical evidence than it is that the jury erred by failing to convict the Appellant of murder. The reason why the jury rejected one theory of the crime while embracing another is unclear. The jury's decision may have been the result of a mistake, or simply an improper exercise of leniency. However, speculation on or inquiry into the jury's motives is improper.

Evidence was presented which would fully satisfy the required elements of either manner of commission of tampering with physical evidence and the jury was able to find guilt beyond a reasonable doubt. When someone leaves a body laying on the ground with multiple stab wounds, flees as bystanders try to stop him, flees as a police officer tries to apprehend him, and disposes of the knife used in what the Appellant himself believed to be an aggravated assault, there is ample evidence on which to base a verdict that the Appellant acted knowing that an investigation was pending or in progress, or knowing that a crime had been committed.

## STATE'S RESPONSE TO APPELLANT'S FOURTH POINT OF ERROR

### *Summary of the Argument*

In his fourth point of error, Appellant argues that the State failed to produce independent evidence to corroborate the Appellant's extrajudicial statement regarding that he tampered with the knife used to kill Thomas Kitto by throwing it

in a creek. Appellant's Brief at 32. The Appellant's approach, that the State should be required to produce corroboration that the Appellant tampered with a knife by throwing it in a creek, is far narrower than what is actually required by the traditional rule of corups delecti. The rule of corups delecti was sufficiently satisfied in this case and the judgment should be affirmed.

**Facts Relevant to Corpus Delecti**

As Ms. Hebert secured her dog that had broken loose, she looked towards the Appellant and saw him pull a fixed-blade knife from his hip (III R.R. at 66-71). A moment later, Thomas Kitto stood mortally injured while the Appellant scrambled backwards, trying to pick up something that he had dropped on the ground (*id.* at 70-72). Thereafter, the Appellant fled the scene as bystanders tried to stop him from driving away (*id.* at 75).

Deputies with the Comal County Sheriff's office responded, secured the scene, and began taking statements (*id.* at 174). On the ground near the body of Mr. Kitto, deputies found a baseball cap and the sheath for a fixed-blade knife (*id.* at 186-189). Later that evening, Deputy Koepp found the Appellant driving a green pick up truck near his residence (IV R.R. at 86). Deputy Koepp initiated a traffic stop and the vehicle eventually came to a stop in a nearby driveway (*id.* R.R. at 88). Deputy Koepp ordered the Appellant to place his hands on the squad

car (*id.* at 89). The Appellant appeared compliant with the deputy's commands and walked towards the squad car with his hands in the air; however, when Deputy Koepp lowered his taser and reached for his handcuffs, the Appellant exclaimed "Fuck that. I'm not going back" and ran (*id.* at 89). Deputy Koepp pursued the Appellant, tackled him in the road, and dragged him back to the squad car where he was secured in hand cuffs (*id.* at 89-91).

Sergeant Ward interviewed the Appellant about the death of Mr. Kitto (III R.R. at 50). During the course of this interview, the Appellant admitted to stabbing Mr. Kitto with a knife that the Appellant kept in a sheath in his back pocket (VIII R.R. State's Ex. 73). The Appellant stated during that interview that he lost the sheath to the knife, that the sheath he lost did not actually belong to the knife he used to kill Mr. Kitto, and that he threw the knife into Sorrell Creek (*id.*). Based on the assertions made during the interview with the Appellant, Sergeant Ward secured a search warrant for the Appellant's residence and sent multiple deputies to search Sorrell Creek for the knife used in the assault (IV R.R. at 148-149). Deputies were not able to locate the knife in Sorrell Creek (*id.* at 149). Both the baseball cap and the knife sheath found at the scene were sent to the DPS lab for testing which confirmed that the Appellant's DNA was on both items (*id.*). Search warrants were executed on the Appellant's residence, on the vehicle that he was driving when he was apprehended, and on the vehicle that he been driving as

51

he fled from Canyon Falls RV Park (*id.* at 148-151). During the search of the residence, deputies were able to recover the shirt that was worn during the assault (*id.*). However, the knife used during the assault could not be located at the scene, in the truck Appellant was driving when apprehended, in the vehicle with which he fled the scene, or in the Appellant's residence (*id.*).

**Authorities on Corpus Delecti**

The common law rule of corpus delecti is a rule of evidentiary sufficiency, which holds that an extrajudicial confession of wrongdoing, standing alone, is insufficient to support a conviction. *Bulington v. State,* 179 S.W.3d 223, 228 (Tex. App.—Texarkana 2005, no pet.). Corpus delecti is a judicially fashioned rule meant to ensure "that a person would not be convicted based solely on his own false confession to a crime that never occurred." *Carrizales v. State,* 414 S.W.3d 737, 740 (Tex. Crim. App. 2013). As such, there must be some other evidence to indicate that a crime has been committed. *Id.; Williams v. State,* 958 S.W.2d 186, 190 (Tex. Crim. App. 1997). This other evidence needs not be sufficient in and of itself to prove the offense; rather, it must merely render the commission of the offense more probable than it would otherwise be. *Id.* The corpus delecti of any crime simply consists of the fact that the crime in question has been committed by someone. *Fisher v. State,* 851 S.W.2d 298, 303 (Tex. Crim. App. 1993). The rule

does not require corroboration as the details of the specific offense, but only that a criminal offense has been committed by someone. *Salazar v. State*, 86 S.W.3d 640, 644 (Tex.Crim.App. 2002). Corpus delecti is satisfied "if some evidence exists outside of the extra-judicial confession which, **considered alone or in connection with the confession**, shows that the crime actually occurred." *Id.* (emphasis added).

The rule of corpus delecti has been sharply criticized because application of the rule can result in the exclusion of reliable confessions. *Miller v. State,* 457 S.W.3d 919, 925 (Tex. Crim. App. 2015). For this very reason, the United States Supreme Court and several other jurisdictions have deviated from the traditional rule of corpus delecti in favor of a trustworthiness standard, which would allow for a conviction based on an extrajudicial statement where there is substantial independent evidence to establish the trustworthiness of the statement. *Id.* Texas has not adopted a trustworthiness standard; however, Texas law does recognize a closely related crimes exception to strict application of the corpus delecti rule in cases where there is a close temporal relationship between the offenses. *Id.* at 927. As such, in a case where a defendant has confessed to multiple offenses in a single interview, the confessional statement as to each of those offenses will not be excluded if the State can establish the corpus delecti of one offense described within the confessional statement. *Id.* at 929. In applying this closely related

53

crimes exception, there is no requirement that a defendant be convicted of the corroborated offense prior to the admission of his contemporaneous statement regarding other closely related crimes. *Id.* Likewise, The ability to prosecute for tampering with physical evidence is not dependent upon first securing a conviction for the underlying offense.

**Argument on Corpus Delecti**

During his recorded interview with Sergeant Ward, the Appellant admitted to stabbing Thomas Kitto with a knife, to keeping that knife in a sheath that did not originally belong to that knife, to pulling the knife from his back pocket, that the knife was a fixed-blade knife, and that he threw the knife used to kill Thomas Kitto into Sorrell Creek (VIII R.R. State's Ex. 73). During her testimony at trial, Andrea Hebert testified that the Appellant drew a knife from his hip, that the knife was a fixed-blade type knife, that Thomas Kitto suffered stab wounds during his conflict with the Appellant, that the Appellant scrambled to pick up something after the fight with Mr. Kitto, and that the Appellant fled from the scene as bystanders tried to stop him. During their search of the crime scene officers located a black knife sheath near the body of Thomas Kitto. That sheath was sent to the crime lab for testing and the Appellant's blood was found on the knife sheath recovered from the scene. Detectives secured search warrants for the Appellant's residence and for the

vehicle he was drove away from the crime scene.  No knife was found during the search of the vehicle that the Appellant used to flee from the scene. During the search of the Appellant's residence, deputies found the shirt that the Appellant had worn during the assault but could not locate a knife. Deputies searched Sorrell Creek but could not find the knife used to kill Thomas Kitto.

The evidence thus establishes that the Appellant did use a fixed-blade knife held in a sheath that was pulled from his back pocket or hip to stab Thomas Kitto and that no such knife was found during searches of the Appellant's home or vehicles.  Deputies did find other evidence that connected the Appellant to the crime, such as the shirt that the Appellant wore during the assault and blood splatter in the Appellant's vehicle, but the knife was not found with that other evidence. Legal sufficiency under corpus delecti is established when some evidence is introduced that by itself or together with the statement indicates that an offense has been committed. In this case, the Appellant describes using a fixed-blade knife, that he kept in a sheath in his back pocket, to stab the Appellant. That portion of the statement is corroborated by eyewitnesses and evidence gathered at the crime scene. The Appellant further describes getting rid of that knife, under the belief that he had committed aggravated assault, by throwing the knife into Sorrell Creek as he drove by on the highway. The fact that the knife was not found with the other evidence located at the scene, at the Appellant's residence, and in the

55

Appellant's vehicle indicates that something else was done with the knife. This circumstantial evidence is sufficient for a reasonable person to believe that it is more likely than not that some criminal offense occurred in the disposition of the knife.

Similar circumstantial arguments have been used to satisfy corpus delecti in other cases. For example, in *Fisher v. State*, the defendant therein confessed in an unrecorded conversation with a friend that he had killed his girlfriend. 851 S.W.2d at 300-301. This statement was admitted at trial and the defendant was convicted of murder. *Id.* On appeal, the court found that the State had satisfied the requirements of corpus delecti by introducing evidence that the victim vanished suddenly and without a trace, that the victim's personal affairs were unresolved when she disappeared, that the relationship between the victim and defendant had become strained, that the victim lacked resources to leave town, that the defendant had cleaned his home around the time of the victim's disappearance, that the defendant had a bruise on his face after the victim's disappearance, and that the defendant had been seen getting rid of the victim's suitcase after her disappearance. *Id.* at 304. Based on this circumstantial evidence, the court found that a reasonable person could conclude that the victim was killed by criminal means. *Id.* The evidence against the Appellant is more than mere circumstance. There is evidence in the record to indicate that he was actually in possession of the

knife used in the assault and that he fled the scene with that knife fearing criminal prosecution. The fact that the knife was not found with the other evidence recovered certainly constitutes circumstances under which a reasonable person could conclude that the knife was disposed of by criminal means. As such, the legal sufficiency rule of corpus delecti is satisfied.

However, if the Court were to find that the evidence as stated does not satisfy a strict application of corpus delecti, then the closely related crimes doctrine should be utilized to satisfy corpus delecti. In this case, the Appellant confessed to stabbing Thomas Kitto in an act that he characterized as "aggravated assault" (VIII R.R. State's Ex. 73). The context of his statement certainly suggests that this aggravated assault or murder would be a crime closely related to the eventual tampering that the Appellant described in throwing his knife into Sorrell Creek. Since the aggravated assault or murder is clearly corroborated by eyewitness accounts and the evidence gathered by detectives, corpus delecti is satisfied and the statement is admissible for the purpose of those offenses. The statement is then also corroborated under the closely related crimes doctrine and corpus delecti is satisfied with regard to the offense of tampering with physical evidence.

For the purpose of corpus delecti, it is irrelevant whether the Appellant was also convicted for aggravated assault or murder. The offense of tampering with physical evidence is still a closely related crime to the sufficiently corroborated

57

offenses of aggravated assault or murder. As such, the conviction should be affirmed.

## PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, the State respectfully requests this Court to deny Appellant's four points of error and affirm Appellant's conviction for the offense of tampering with physical evidence as alleged in the indictment.

Respectfully Submitted,

/s/ Clayten Hearrell
**Clayten Hearrell**
Assistant Criminal District Attorney
SBN: 24059919
150 N. Seguin Ave., Suite 307
New Braunfels, Texas 78130
Phone: (830) 221-1300
Fax: (830) 608-2008
hearrc@co.comal.tx.us

ATTORNEY FOR THE STATE

## CERTIFICATE OF SERVICE

I, Clayten Hearrell, attorney for the State of Texas, Appellee, hereby certify that a true and correct copy of this brief has been delivered to the attorney of record for ERIC BYRON CRAYTON:

Mr. Richard Wetzel
wetzel_law@1411west.com
1411 West Avenue, Suite 100
Austin, TX 78701
(512) 469-7943
(512) 474-5594
*Attorney for Appellant on Appeal*

By electronically sending it to the above-listed email address through efile.txcourts.gov, this 3rd day of July, 2015.

/s/ Clayten Hearrell
**Clayten Hearrell**


## CERTIFICATE OF COMPLIANCE

I, Clayten Hearrell, hereby certify that this document was prepared in MS Word and it does not exceed the allowable length for an appellate brief, pursuant to Tex. R. App. Pro. 9.4, as amended and adopted on November 30, 2012, by Order of the Texas Court of Criminal Appeals. The approximate total of words in this document, as calculated by the word processing software, is 14,218 words.

/s/ Clayten Hearrell
**Clayten Hearrell**